(173 P.3d 1159)
No. 97,461

THOMAS O. GUSS, PH.D., *Appellee*, v. FORT HAYS STATE UNIVERSITY, A UNIVERSITY ORGANIZED UNDER THE LAWS OF THE STATE OF KANSAS, *Appellant*.

Opinion filed January 11, 2008.

*Wm. Scott Hesse*, assistant attorney general, and *Todd Powell*, general counsel, Fort Hays State University, for appellant.

*David M. Schauner*, of Kansas National Education Association, and *Gene F. Anderson*, of Anderson & Wichman, of Hays, for appellee.

Before CAPLINGER, P.J., McANANY, J., and BRAZIL, S.J.

McANANY, J.: This appeal arises out of a dispute between Fort Hays State University and Dr. Thomas O. Guss, a faculty member, regarding the interpretation of Guss' retirement agreement. Guss sought judicial review of the University's adverse interpretation of the agreement. On review the district court interpreted the agreement in Guss' favor. The University now appeals, claiming the district court erred in its interpretation of the agreement. The University also contends that Guss failed to exhaust his administrative remedies and failed to file his petition for judicial review within the requisite time period.

Guss began his transition into retirement in 2003. He and the University executed a Notice of Continuing Tenured Faculty Appointment on June 25, 2003. The University agreed to employ Guss half-time as a professor for the 2003-2004 academic year. The no-

tice contained the statement: "Details are included in the phased retirement agreement."

The 5-year phased retirement agreement was entered into 2 days later on June 27, 2003. The agreement was effective August 17, 2003. Guss agreed to work half-time as a professor at an annual salary of $26,004. He remained eligible for annual merit salary adjustments. The University agreed to continue Guss' half-time position until May 18, 2008, subject to certain contingencies. With respect to his half-time teaching schedule, "[t]he exact schedule by which this reduction is achieved may be adjusted annually by mutual agreement between the Employee and the University."

The parties agreed to begin Guss' phased retirement by Guss being off work for the fall semester of the 2003-2004 academic year and then teaching full-time during the spring semester. There is no dispute that Guss fulfilled his obligations for the 2003-2004 academic year.

On June 9, 2004, Guss received an annual salary increase to $27,104 for the coming 2004-2005 academic year. On June 17, 2004, the University issued its Statement of Responsibilities for the 2004-2005 academic year. The statement required Guss to teach 6 credit hours in the 2004 fall semester and 6 credit hours in the 2005 spring semester. Guss rejected this schedule and insisted that he continue to teach on the schedule which had been used since the inception of his phased retirement. The University responded that it had the right to establish Guss' schedule and it expected Guss to teach half-time during both semesters of the coming school year. Guss was directed to be present at the University no later than August 23, 2004, to undertake his teaching duties for the fall semester. Guss was instructed: "[I]f you fail to be present and commence your teaching duties, we will consider you to have abandoned your position and will initiate appropriate proceedings to terminate your contract with Fort Hays State University." When Guss did not appear in Hays as directed, the University informed Guss that his employment would be terminated effective September 15, 2004.

Guss filed an informal grievance with the University, asserting his right to reject a unilaterally imposed class schedule and his right

to be paid for unused sick leave. Following a departmental hearing, the grievance committee announced on December 8, 2004, that it rejected Guss' argument regarding his teaching schedule under the phased retirement agreement, but recognized that Guss was entitled to reimbursement for sick leave pay. Six days later, Dean Guy Mills advised Guss' counsel that he concurred with the recommendations of the grievance committee.

Guss appealed Mills' decision. On February 18, 2005, the University Appeals Committee issued its recommendation to the University's president, Edward Hammond. The appeals committee agreed with Mills' decision that Guss was required to teach half-time both semesters and that he was entitled to be paid for unused sick leave. In a letter dated February 24, 2005, Hammond stated that he accepted the recommendations of the University Appeals Committee.

Within 30 days thereafter, on March 23, 2005, Guss filed a petition for judicial review with the district court.

On April 12, 2005, almost 2 months after he accepted the recommendations of the University Appeals Committee, Hammond issued a letter informing Guss that he had concluded both the formal and informal phases of the University's grievance procedures, and therefore Guss had exhausted his administrative remedies. The letter purported to serve as notice of a final agency action by the University. The University then filed a motion to dismiss Guss' petition for judicial review. It argued that the district court lacked subject matter jurisdiction because Guss failed to exhaust his administrative remedies before seeking judicial review and failed to timely file his petition for judicial review.

The district court rejected the University's jurisdiction and contract interpretation arguments, entered a money judgment in favor of Guss for his unpaid salary, and ordered Guss to be reinstated for the remaining term of his contract. The court also affirmed the University's decision that Guss was entitled to sick leave pay.

The University appealed.

*Exhaustion of Administrative Remedies*

The first question before us is whether Guss exhausted his administrative remedies before seeking relief in the district court. The Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, requires the exhaustion of administrative remedies before seeking judicial review. K.S.A. 77-612; *Cole v. Mayans*, 276 Kan. 866, 870, 80 P.3d 384 (2003). Whether Guss failed to exhaust his administrative remedies is a question of law over which our review is unlimited. 276 Kan. at 869.

The University contends that Guss filed his petition for judicial review on March 23, 2005, before the University issued its final order in the form of Hammond's April 12, 2005, letter to Guss. Guss had to file his petition for judicial review within 30 days after service of a final order. K.S.A. 77-613(b). While the KJRA does not define a final order, an agency's order is a particular type of agency "action." See *Wiest v. Kansas Board of Regents*, 30 Kan. App. 2d 301, 304, 40 P.3d 988 (2002). It is an agency action which determines the legal rights and duties of the parties. See K.S.A. 77-602(e). An agency action is nonfinal if the agency intends, or is reasonably believed to intend, that its action is "preliminary, preparatory, procedural or intermediate." See K.S.A. 77-607(b)(2). A "final agency action" is simply any agency action other than a nonfinal agency action. K.S.A. 77-607(b)(1).

No special incantations or magic words are required to create a final agency order. Kansas courts have consistently recognized that a relatively informal letter may constitute a final order for purposes of the statute. For example, see *Reifschneider v. Kansas State Lottery*, 266 Kan. 338, 969 P.2d 875 (1998). In the context of disputes between universities and faculty members, see *Wiest* as well as *Schall v. Wichita State University*, 269 Kan. 456, 7 P.3d 1144 (2000).

While Hammond's letter of February 24, 2005, appears to inform Guss of the University's final decision on the matter, the University claims that it did not because it failed to resolve the issue of sick pay.

An order cannot be final if the matter is still under "active consideration" by the tribunal. *Bruns v. Kansas State Bd. of Technical Professions*, 19 Kan. App. 2d 83, 85, 864 P.2d 1212 (1993), *aff'd* 255 Kan. 728, 877 P.2d 391 (1994). In the February 24, 2005, letter, Hammond agreed with the committee's recommendation that Guss should be paid the value of his outstanding sick leave using the University's regular procedure for making such a calculation. There was no dispute as to the amount of Guss' accumulated sick leave. Hammond directed that Tom Kuhn in the personnel office make the calculation so that the University could issue a check in the appropriate amount to Guss. The fact that there remained to be done the ministerial tasks of doing the mathematical calculation and issuing a check does not establish that the matter was still under active consideration. We are not persuaded by the University's argument on this point.

The University points out that Hammond's letter of February 24, 2005, was directed to Dr. John Heinrichs, the author of the February 18, 2005, letter which informed Hammond of the decision of the appeals committee. A copy was directed to Guss' attorney. The University also points out that Hammond's letter does not state the person at the University designated to receive service of process in any action for judicial review. From this, the University argues that Guss' appeal was premature since the letter does not satisfy the requirements of K.S.A. 77-613(e).

K.S.A. 77-613(e) states in pertinent part:

"Service of an order, pleading or other matter shall be made upon the parties to the agency proceeding and their attorneys of record, if any, by delivering a copy of it to them or by mailing a copy of it to them at their last known addresses. . . . Unless reconsideration is a prerequisite for seeking judicial review, a final order shall state the agency officer to receive service of a petition for judicial review on behalf of the agency."

Failure to satisfy K.S.A. 77-613(e) does not mean that Hammond's letter was not the University's final order. In *Reifschneider*, the court declared that strict compliance with this statute is required. However, failure to do so does not render the document something other than a final order; rather, it simply tolls 30-day period for the filing of a petition for judicial review.

Finally, the actions of the University belie any suggestion that Hammond's February 24, 2005, letter was not intended to be the University's final order. The University followed the procedure and time schedule for grievances set forth in the University handbook. The departmental hearing committee rendered its decision within 10 working days of its hearing. The dean informed Guss that he concurred with the committee's recommendations within 10 working days following receipt of the departmental hearing committee's decision. When the appeals committee communicated its recommendation to Hammond, it cautioned him that the University's Faculty Handbook required him to express his concurrence with the committee's recommendation within 10 days. Hammond communicated his concurrence with the decision of the appeals committee within 10 days of the appeals committee's recommendation to him. The letter of April 12, 2005, which the University now claims to be the final order, was issued *nearly 2 months* after Hammond received the University Appeals Committee's recommendation.

The district court did not err in concluding that the University's letter of February 24, 2005, constituted a final order despite the remaining ministerial task of calculating the value of Guss' unused sick leave, and despite the failure of the letter to strictly comply with the requirements of K.S.A. 77-613(e).

We note in passing the University's claim that Guss' petition for judicial review was untimely in light of K.S.A. 77-613, which requires the petition to be filed within 30 days after service of the agency's final order. Since the University issued its final order on February 24, 2005, Guss' petition filed on March 23, 2005, was timely.

*Contract Interpretation*

Contract interpretation is a matter of law over which we exercise unlimited review. See *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001). However, the University argues that when the contract is of a type which regularly appears before the agency and with which the agency must acquire some familiarity and expertise, the agency's interpretation, if reasonable,

is persuasive and is entitled to careful consideration by reviewing courts. *Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA*, 233 Kan. 801, 810, 667 P.2d 306 (1983). The issues presented here are matters of ordinary contract interpretation in the familiar context of an employment agreement. They involve no specialized or arcane expertise of the University. The University does not suggest that the fact that the employee in question is a college professor adds to the mix a consideration over which the University has special insight beyond that of the courts. Further, the University is not a neutral arbiter called upon to resolve a dispute between competing parties. The University is one of the competing parties itself. It is a party to the contract it now seeks to interpret. Its interpretation of the contract can hardly be viewed as impartial. Accordingly, we will examine anew the interpretation of the University's contract with Guss.

The task at hand is to ascertain the intent of the parties. If the terms of the contract are clear, there is no room for rules of construction, and the intent of the parties is determined from the contract itself. *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002). Thus, absent any ambiguity, we must give effect to the intent of the parties as expressed within the four corners of the contract. *Blair Constr., Inc. v. McBeth*, 273 Kan. 679, 691, 44 P.3d 1244 (2002).

The University asserts four claims regarding interpretation of this contract, none of which has merit. They are: (1) a plain reading of the agreement requires Guss to work half-time during the entire academic year, not merely full-time one semester; (2) pursuant to paragraph 1 of the phased retirement agreement, the University may unilaterally adjust Guss' work schedule; (3) the mutual agreement requirement of paragraph 1 applies not to the actual scheduling of classes, but to Guss' part-time status; and (4) the University has an absolute right to direct Guss' work pursuant to the Public Employer-Employee Retirement Act (PEERA) and the AAUP.

The provisions having any potential bearing on this matter are found in paragraphs 1, 7, and 8 of the agreement. Paragraph 1 provides:

"Effective August 17, 2003, Employee shall be appointed to the position of Professor of Educational Administration and Counseling on a half-time (.5 FTE) nine-months appointment, at an annual salary of $26,004. The exact schedule by which this reduction is achieved may be adjusted annually by mutual agreement between the Employee and the University."

Paragraph 7 provides:

"While this Agreement is otherwise irrevocable, the Employee and the University may, by mutual agreement, modify the terms hereof at any time prior to Employee's retirement, to reduce further the Employee's fractional time appointment or to provide for an earlier full retirement date for Employee. Any such modification of this Agreement must be in writing."

Paragraph 8 provides:

"This Agreement [1] is intended to terminate any previous agreement, contract, or understanding concerning this employment relationship; [2] will remain in effect even if the University subsequently establishes different policies or enters into agreements containing different terms and conditions of employment of any unclassified employee; [3] is subject to all provisions of the laws of Kansas, the regulations, policies, minutes, and resolutions of the Board of Regents and the rules, regulations, and policies of University; and [4] is subject to such additional terms as set forth in Employee's annual Letter of Appointment."

Considering the University's contentions in order, a plain reading of the agreement *does not* require Guss to work half-time during the entire academic year as opposed to full-time one semester. We find no ambiguity in the contract. The contract calls for a traditional 9-month appointment, consistent with the typical academic year. Rather than working full-time, however, Guss' work obligation is reduced to half-time. As plainly and clearly stated by the agreement: "The exact schedule by which this reduction is achieved may be adjusted annually by mutual agreement between the Employee and the University." It is clear that the reduction to a half-time schedule could be accomplished in various ways, and the parties were free to adjust the schedule by mutual agreement to accomplish this end. No reasonable reading of the agreement leads to the conclusion that Guss was required to work half-time during each semester.

Next, the University argues that pursuant to paragraph 1 of the phased retirement agreement, the University *may* adjust Guss'

schedule annually but is not required to do so. This is true. Adjustments in the schedule are by mutual agreement, and the University can withhold its consent to a change. However, the University extends its argument to the assertion that it may unilaterally amend the schedule as it sees fit. This interpretation ignores the clear and unambiguous expression in the contract. Stripped of excess verbiage, the essence of the last sentence of paragraph 1 is: The schedule may be adjusted by mutual agreement. Thus, if the parties cannot mutually agree to an adjustment, the schedule will not change. To read the sentence otherwise would render useless the phrase "by mutual agreement," contrary to well-established case law. See, *e.g.*, *LDF Food Group, Inc. v. Liberty Mut. Fire Ins. Co.*, 36 Kan. App. 2d 853, 863, 146 P.3d 1088 (2006) ("judicial interpretation should not render any term meaningless").

Next, the University argues that the mutual agreement requirement of paragraph 1 applies not to the actual scheduling of classes, but only to Guss' part-time status; thus, it applies only to Guss' decision to work more or less than half-time. Such an interpretation renders a portion of the phased retirement agreement meaningless. Paragraph 7 of the agreement specifically delineates the procedure for adjusting an employee's workload, which also must be done by mutual agreement. If we were to apply the mutual agreement requirement only to a further change in Guss' workload, the mutual agreement requirement in paragraph 7 would be superfluous. Further, the last sentence of paragraph 1 states: "The exact schedule by which *this* reduction is achieved . . . ." (Emphasis added.) "This reduction" refers to Guss' half-time status, not some other workload agreement.

Next, the University points to the provision in paragraph 8 that the agreement "is subject to all provisions of the laws of Kansas, the regulations, policies, minutes, and resolutions of the Board of Regents and the rules, regulations, and policies of University." From this the University argues that it has authority to make any final determination of teaching assignments pursuant to its collective bargaining agreement with the AAUP.

This argument fails for two reasons. First, the collective bargaining agreement was not incorporated into the phased retire-

ment agreement, and the AAUP was not a party to the negotiations or Guss' phased retirement agreement. Second, if the collective bargaining agreement were to take precedence as the University suggests, for the University to negotiate individual contracts with its faculty members would be a meaningless exercise. Here, the University contracted away its right to unilaterally determine Guss' schedule by entering into the phased retirement agreement.

The University also cites to K.S.A. 75-4326(a) of PEERA, which states that nothing in the act is meant to affect the existing rights of a public employer to "[d]irect the work of its employees." PEERA does not give the University the right to disregard contracts of employment in directing the work of its employees. Rather, PEERA permits the University to direct the work of its employees *notwithstanding* the provisions of PEERA. In other words, PEERA is subordinate to the University's right to direct the work of its employees. Here, the University has contracted away its absolute right to direct Guss' work and has agreed that changes to Guss' schedule must be based upon the mutual agreement of the parties.

Finally, the University argues from this same provision in paragraph 8 that the district court's interpretation of the contract provides University faculty members with the absolute right to set their own schedules, contrary to University policy. It does not. The University's argument ignores the provision for schedule change by "mutual agreement." While the University normally has the right to set the schedules of its faculty members, here the University negotiated away that right in the phased retirement agreement by agreeing to schedule changes only upon the mutual agreement by the parties.

Even if we were to defer to the University's interpretation of the contract, we find no rational basis upon which to uphold the University's interpretation of the phased retirement agreement. Because Guss did not agree to a schedule adjustment, the University was required to continue his employment pursuant to their initial agreement as provided in the Statement of Responsibilities 2003-

2004. The district court did not err in its interpretation of the agreement.

Affirmed.